UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JAMES G. CUTTS,

       Plaintiff,

                                        File No.  1:05-CV-36

v.

                                        HON. ROBERT HOLMES BELL

STEELCASE INC.,

       Defendant.

_____/


**O P I N I O N**

      This civil rights action alleging race-based discrimination, harassment and retaliation is before the Court on Defendant's motion for summary judgment or, in the alternative, for partial summary judgment limiting Plaintiff's claim for economic damages.  For the reasons that follow Defendant's motion for summary judgment on all of Plaintiff's claims as to liability will be granted.

**I.**

      Plaintiff James G. Cutts is an African American male who was employed by Steelcase Inc., in Grand Rapids, Michigan, as an at-will hourly employee from April 1988 until his discharge in October 2002.  During his tenure he held a variety of positions, including production trainee, warehouser, sweeper, miscellaneous laborer, material handler, welder, and repairman.  (Pl. Ex. 9).

The Steelcase Employee Handbook contains the Steelcase Employee Performance System ("SEPS").  (Pl. Ex. 7 at 114). SEPS is designed to recognize good performance and to assure mature treatment of employees if performance problems arise.  SEPS includes recognition to reinforce good performance, coaching to enhance employee performance or discuss concerns before they become performance problems, and formal discipline which is generally applied in three steps: 1) Oral Reminder, 2) Written Reminder, and 3) Decision Making Leave.  (Pl. Ex. 7 at 117-21).

o September 16, 2001,Plaintiff bid on and received a position in the Lateral Trim Department of the Steelcase File Plant in Grand Rapids as a "bay puller" or "line manager." In this position Plaintiff was required to gather the component parts needed to assemble a particular file cabinet and to take them to the assembly lines for building.  If the builders did not receive all of the correct parts they would have to radio the bay puller for the correct parts.  Such errors on the part of the bay pullers would cause the assembly line to slow down and would negatively impact the incentive pay for the entire group.

Plaintiff's immediate supervisor in the Lateral Trim Department was August Swanson, and the superintendent of the File Plant was Dawn Waalkes.  By early 2002 Waalkes was aware that there were problems with Plaintiff's job performance.  Co-workers were telling her that he was making too many errors.  (Waalkes Decl ¶ 5).  On January 17, 2002, after Plaintiff had been in the Lateral Trim Department for four months, Swanson noted in Plaintiff's performance appraisal:

> James you have had time to learn the line managers job.  You need to work on making less mistakes.  There are too many mistakes being made and we owe it to the builders to improve.

(Ex. 27 at 2).  Waalkes added the following comment:

> James – Thanks for your efforts.  I appreciate you are trying hard, but I am concerned about the number of errors and the downtime on the lines.  I've asked Augie [Swanson] to work with you to improve in this area, otherwise we'll have to consider disqualifying you.  Let us know how we can help you improve.

(Ex. 27 at 4; Waalkes Decl. ¶ 6).  In his written response to the performance appraisal Plaintiff indicated:

> I can be helped to over quality issues by continuously up grading the process.  Many of the proccess lead to potential errors for any employees.  The more the process is rectified, the better my chances of improving will become, especially coming from a disadvantage of not knowing anything about the product in a complexed working environment.

(Ex. 27 at 6).

On January 21, 2002, Swanson met with plaintiff for a coaching session.  (Ex. 28).  Swanson described the problem as "Too many mistakes being made while James is setting work up for the trim lines.  Build lines running out of work."  (Ex. 28).

On March 1, Swanson gave Plaintiff an additional coaching session.  (Ex. 26 at 2).  Swanson assigned Plaintiff to work in the assembly area for three weeks, believing that this would help Plaintiff learn the parts that go into each lateral file (called "cases").  Swanson Decl ¶ 12).  Plaintiff returned to the Lateral Trim Department on March 22, 2002.

3

On March 29, 2002, Waalkes met with Plaintiff at his request to give him feedback on how he was doing.  (Ex. 29).  Waalkes advised Plaintiff that despite his efforts, he continued to be very slow.  She advised him that other bay pullers could set up cases two to three times faster than Plaintiff;  Plaintiff was making frequent errors in setting up his loads; and Plaintiff was not retaining training information.  "I told James that given the length of time in the job, his performance wasn't where it should be."  (Ex. 29; Waalkes Decl. ¶ 8). In response, Plaintiff advised Waalkes that Tom Hoffer, another bay puller, came in early, skipped the start-up meeting and took the easiest jobs, which limited Plaintiff's ability to stay caught up.  (Ex. 29).  Plaintiff also advised that he was being harassed by the line 3 set up people.  They called him excessively and frequently and verbally harassed him both on the radio and in person.  Plaintiff also offered suggestions on how to improve the process in the department.  Waalkes told Plaintiff she would investigate the issues he raised and get back with him.  (Ex. 29).

Plaintiff filed his own account of the March 29, 2002 meeting.  (Ex. 31; Cutts Dep. at 258).  He explained his lack of speed and his excessive error rate in January, but claimed that his performance had improved as a result of his training in the assembly area.  He suggested improvements in the system to make it more fair and efficient.

As a follow up to the March 29, 2002 meeting Waalkes met with four of Plaintiff's co-employees who confirmed that the line 3 set up people were demanding and gave people a hard time if there were errors.  They did not believe that the line 3 people singled anyone

out, but they did observe that Plaintiff was called more often because he made many mistakes.  (Ex. 32 & 33).  Plaintiff's co-employees told Waalkes that Plaintiff had been trained more than any other employee, but he still was slow, made many errors, asked the same questions over and over, and was having problems handling the demands of the job. (Ex. 32).  Plaintiff was aware that Waalkes conducted this investigation, but he was hoping for an investigation to support his claim, and instead she went against him. (Cutts Dep. at 211-12).

On April 24, 2002, Swanson met with Plaintiff and gave him an Oral Reminder under the SEPS for poor work performance based on "Too many mistakes being made while James is setting work up for the trim lines.  Build lines running out of work."  (Ex. 26 at 2; Ex. 34; Swanson Decl. ¶ 13).  Swanson noted on the discussion guide that he had previously discussed this problem with Plaintiff on five occasions.  (Ex. 34).  Swanson expressly told Plaintiff orally and in writing that continued performance issues could lead to termination. (Swanson Decl. ¶ 13; Waalkes Decl. ¶ 10; Ex 34 at 2).

Because Plaintiff wanted someone with more authority at the disciplinary meeting, the meeting was continued on April 25, 2002, with Waalkes and Larry Looyenga, the Employee Relations Manager.  In response to the Oral Reminder Plaintiff advised that he had an ADD and Dyslexia problem.  Plaintiff requested that he be given clear expectations to accomplish his employer's goals and that he be given documentation regarding complaints about his work so that he could track down their true causes.  (Ex. 34; Cutts Dep. at 268-69).  Plaintiff

disagreed with the Oral Reminder and asked Looyenga to remove it from his file, but Looyenga determined that the Oral Reminder was warranted because there was enough evidence to support Plaintiff's inadequate work performance.  (Looyenga Decl. ¶ 6).

Plaintiff advised the participants at the April 25, 2002 meeting of two racial harassment incidents.  He complained that Leroy, or Lee Hopkins, a co-worker, had called him "nigger" in January 2002,  and that during an argument with Beth Toth, a co-worker, Beth told him to "kiss her white butt."  (Waalkes Decl. ¶ 11; Looyenga Decl. ¶ 5; Cutts Dep. at 220-24, 232-35).  According to Defendants, Plaintiff initially stated that he had reported Leroy's use of the term "nigger" to his supervisor, Swanson, but later agreed with Swanson that Plaintiff only told Swanson that someone made a comment and that Plaintiff would take care of it.  (Ex. 26 at 2; Swanson Decl. ¶ 28; Waalkes Decl. ¶ 11; Looyenga Decl. ¶ 5). Waalkes immediately requested that the allegations be investigated.  (Waalkes Decl. ¶ 11).

Plaintiff testified at his deposition that in addition to calling him "nigger," Leroy also told Plaintiff, "Boy, get over here," and that statements such as "Watching you work is better than watching T.V.", on at least five to ten occasions between January and March 2002. Plaintiff testified that he reported each of these incidents to Swanson, and that each time he did so, Swanson did nothing.  (Cutts Dep. at 220-26).

Karen Holtsclaw, Steelcase's internal EEO official, conducted the investigation into Plaintiff's allegations.  Leroy adamantly denied using the racial epithet, and Holtsclaw was unable to find any corroborative evidence that the episode had occurred.  (Waalkes Decl.

¶¶ 11-12; Looyenga Decl. ¶ 7).  In her investigation of the "white butt" comment, Holtsclaw determined that the supervisor had promptly and appropriately addressed the incident with Beth.  (Waalkes Decl. ¶ 12; Looyenga Decl. ¶ 7).  Waalkes never saw or heard any racial harassment by the employees in the File Plant, nor did anyone besides Plaintiff ever report to Waalkes any incident of racial harassment.  (Waalkes Decl. ¶ 13).  Waalkes nevertheless conducted a department meeting to remind all of the employees about the requirements of Steelcase's policy prohibiting harassment. (Waalkes Decl. ¶ 11).

In May 2002 Swanson met with Plaintiff four times to discuss his work performance and to give him coaching on his mistakes and low production rates.  (Ex. 26 at 3-4; Swanson Decl. ¶ 14).  In June 2002 Plaintiff showed some improvement in his performance.  (Ex. 26 at 4).  On July 15, 2002, Swanson met with Plaintiff to inquire into a report that Plaintiff had made a threatening comment about a co-employee named Rex.  Plaintiff denied the allegation.  (Cutts Dep. at 248; Ex. 26 at 4).  Plaintiff testified, however, that he did have difficulty with Rex because in April or May 2002, Rex began taking Plaintiff's notepad, telling Plaintiff how to do his job, telling Plaintiff that nobody in the department liked him, moving Plaintiff's work tickets, and interfering with Plaintiff's computer. (Cutts Dep. at 236-48).

On July 18, 19, and 20 Swanson met with Plaintiff to discuss problems with his work performance, including missing parts, wrong parts, paperwork errors, erroneously reporting

that parts were unavailable, refusing advice, shutting down the paint line, and asking others to do his work.  (Ex. 26; at 4-5; Swanson Decl. ¶ 15; Cutts Dep. at 290-96).

On July 23, 2002, Swanson conducted Plaintiff's Performance Appraisal for the January 22, 2002 through July 22, 2002, time period.  Swanson indicated that Plaintiff needed to improve in the quality and quantity of his work.  Swanson commented that if Plaintiff did not make acceptable improvements in the accuracy of his work Plaintiff would be moved into the next step of formal discipline, a Written Reminder.  Plaintiff was denied an increase in pay due to his poor performance (Ex. 36; Swanson Decl. ¶ 16; Waalkes Decl. ¶ 14; Cutts Dep. at 296-97).

On July 29, 2002, Swanson met with Plaintiff to discuss his work performance and for a coaching session because Swanson's audit of Plaintiff's work revealed numerous errors in Plaintiff's performance.  (Ex. 26 at 6-7; Swanson Decl. ¶ 17).

On August 2, 2002, Swanson issued Plaintiff a Written Reminder, the second step in the formal disciplinary process, due to Plaintiff's excessive mistakes in setting up cases. (Ex. 26; Ex. 37; Waalkes Decl. ¶ 15; Swanson Decl. ¶ 17; Looyenga Decl. ¶ 8).

On August 7, 2002, the Michigan Department of Civil Rights issued a Statement of Concern indicating that Plaintiff had raised an issue that he was being subjected to harassment and discipline because of his race.  Specifically, Plaintiff had indicated that he had been "subjected to racially derogatory comments, slurs, and teasing, most recently on

8

July 31, 2002."  In addition, Plaintiff indicated that he had received a written reprimand on August 2, 2002, allegedly for allowing the line to go down.  (Pl. Ex. 38).

Plaintiff filed a charge of discrimination with the Michigan Department of Civil Rights and the EEOC on August 20, 2002.  (Ex. 39).  He alleged in the complaint that he was disciplined because of his race:

> I received two disciplines in the past six months, an oral reprimand on April 25, 2002, and a written reprimand on August 2, 2002, allegedly for performance issues.  I allege, however, that my performance and quality has suffered due to harassment in the form of stealing my paperwork and other inappropriate behaviors, which I believe is also based on my race.  While my employer appears to have addressed the actual acts of harassment through verbal warnings to the department, my employer has allowed my disciplines to stand.  I am aware of six co-workers, five of them White, one of them Hispanic, who have similar or worse performance and have not been disciplined as a result.

(Ex. 39).

On August 8, 2002 and August 23, 2002, Swanson met with Plaintiff for coaching sessions to discuss errors in his work performance.  (Ex. 26 at 7-8; Swanson Decl. ¶ 18).  Because Plaintiff continued to have performance problems in his position as a bay puller, Swanson, and Looyenga encouraged Plaintiff to look for job postings that might be a better fit for him and where he would be able to succeed.  (Swanson Decl. ¶ 19; Looyenga Decl. ¶ 8).  In August 2002 Plaintiff posted for and received an assembly job in another area, but turned the job down on August 23, 2002, after trying it for two days.  (Ex. 26 at 8).

On August 27, 2002, Swanson, Waalkes, and Looyenga met with Plaintiff to place him into Decision Making Leave ("DML") for failing to improve his work performance

9

problems since becoming a bay puller in September 2001.  (Ex. 26 at 8; Cutts 339-40).

Plaintiff was given a paid day off to decide whether he wanted to continue working at

Steelcase and to allow him to create an Action Plan identifying what he was going to do to

improve his performance.  (Swanson Decl. ¶ 20; Waalkes Decl. ¶ 16; Looyenga Decl. ¶ 10).

Plaintiff submitted a DML Action Plan on August 29, 2002, but his Plan was rejected

because Plaintiff did not accept responsibility for his work performance problems.  Plaintiff's

second DML Action Plan, submitted on September 5, 2002, was rejected for the same

reasons.  (Cutts Dep. at 359-60; Ex. 42; Swanson Decl. ¶ 21; Waalkes Decl. ¶ 17; Looyenga

Decl. ¶ 10).

Management wrote up its own action plan for Plaintiff.  (Ex. 26 at 9-10; Ex. 43).

Rather than agreeing to the DML Action Plan and continuing to work as a bay puller,

Plaintiff accepted a transfer into an assembly position on 3rd shift.  On September 15, 2002,

Plaintiff signed the DML Agreement that outlined the requirements for continued

employment as an assembler.  (Ex. 44; Waalkes Decl. ¶ 18).

Plaintiff started as an assembler on third shift on September 16, 2002.  His supervisor

was David Polmanteer.  Although Plaintiff had previously worked as an assembler for three

weeks in March 2002, he was trained as if he were a new employee.  Plaintiff was trained for

one week and was expected to achieve a 100% rate at the end of the following two weeks.

A 100% rate was considered the bare minimum that an employee was required to meet and

it was not considered a high expectation.  (Polmanteer Decl. ¶¶ 5-10).  Although most

10

employees consistently make rate within two weeks, Plaintiff almost never made rate. (Polmanteer Decl. ¶ 10).  Polmanteer had coaching sessions with Plaintiff on September 26, September 27, October 1, October 9, October 15, and October 16, 2002.  Plaintiff was suspended on October 17, 2002, and was discharged effective October 18, 2002, for violating his DML Agreement for work performance.  (Ex. 46; Ex. 49).

On October 29, 2002, Plaintiff filed a second charge of discrimination with the MDCR alleging that he was discharged in retaliation for filing his first MDCR charge. (Ex. 51).

On November 19, 2004, at Plaintiff's request, the MDCR issued Plaintiff Notice of Right to Sue letters on each of his discrimination charges.  (Ex. 52 & Ex. 53).  Plaintiff filed this action *pro se* on January 13, 2005.  He subsequently secured counsel who filed an amended complaint on his behalf on June 2, 2005.  Plaintiff's amended complaint alleges claims of race discrimination, racial harassment/hostile environment, and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), and the Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2101, *et seq.*  Defendant has moved for summary judgment on all of Plaintiff's claims.

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment the Court must

look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If Defendants carry their burden of showing there is an absence of evidence to support a claim, Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

Plaintiff's response to Defendant's motion for summary judgment essentially repeats the allegations in Plaintiff's amended complaint. Plaintiff has not included any references to the applicable case law. More significantly, Plaintiff has not produced any evidence of his own or pointed to any evidence produced by Defendant that would create an issue of fact for trial. Although Plaintiff has filed an "affidavit" in support of his response, the affidavit is unsigned. As such, the affidavit is unsworn and does not constitute evidence. Furthermore, the affidavit contains numerous matters that are beyond the personal knowledge of Plaintiff. For example, the affidavit asserts that a number of individuals will testify in a certain way in court. Rule 56(e) requires affidavits to be based on personal knowledge and to set forth facts as would be admissible in evidence. FED. R. CIV. P. 56(e). "A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact." *Sperle v. Michigan Dept. of Corrections* 297 F.3d 483, 495 (6th Cir. 2002) (citing *Weberg v. Franks*, 229 F.3d 514, 526 n. 13 (6th Cir. 2000)). Plaintiff's representations regarding what others would testify to at trial are hearsay and

12

would be inadmissible under FED. R. EVID. 802.  Accordingly, even if the affidavit had been

signed, most of its contents could not be considered by the Court.

Plaintiff's response does reference six exhibits by number.  Because Plaintiff has not

attached any of his own exhibits, the Court assumes these are references to Defendant's

exhibits.  In response to Defendant's motion for summary judgment on the issue of race-

based harassment Plaintiff states:

> Defendant subjected Plaintiff to race based harassment in the work
> environment by empowering all white co-workers to prejudge Plaintiff's
> performance while eliminating all minorities from judging Plaintiff's.  (See
> Exhibits 28, 30, and 35).

(Pl. Resp. at 3).  Two of the referenced exhibits, Exhibits 30 and 35, have not been filed with

the Court by either Plaintiff or Defendant.  They are not a part of the record.  The third,

Exhibit 28, does not support Plaintiff's assertion.  Exhibit 28 is an Employee Performance

System Discussion Guide signed by Plaintiff and his supervisor, August Swanson.  There is

nothing in this exhibit that can reasonably be inferred as "empowering all white co-workers

to prejudge Plaintiff's performance."

In response to Defendant's motion for summary judgment on the issue of retaliation,

Plaintiff states:

> Thomas Allsberry stated to Plaintiff as a threat that if Plaintiff reported
> Plaintiff's work related race problems to the Department of Civil Rights or any
> outside agency Plaintiff would jeopardize Plaintiff's employment.  (See,
> exhibit 41, 42, and 43).

13

(Pl. Resp. at 5).  Exhibits 41, 42 and 43 are a series of Decision Making Leave plans dated August 29, 2002, September 2, 2002, and September 12, 2002.  None of these exhibits references Thomas Allsberry or contains any direct evidence of a threat of retaliation should Plaintiff report his race related complaints to the MDCR.  Neither do they contain any evidence from which such a threat can reasonably be inferred.

Although portions of Plaintiff's deposition are attached to Defendant's motion, there is no citation to the deposition in Plaintiff's response.  In order to meet his burden of setting forth "specific facts showing there is a genuine issue for trial,"  FED. R. CIV. P. 56(c), the non-moving party must designate portions of the record "with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 405 (6th Cir. 1992) (quoting *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 19891)).  The trial court has no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact."  *Id.* at 404 (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989).  Indeed, it would be inappropriate to do so.[1]

---

[1]As noted in *Guarino:*

[I]t seems to us utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion. Such a role would carry the court far beyond simply reviewing evidence in "the light most favorable to the non-moving party," or giving effect to inferences reasonably arising from the designated evidence. For these and other entirely sound reasons, the Rule requires the non-moving party to do

Although the deficiencies in Plaintiff's affidavit and response to the motion were noted in Defendant's March 16, 2006, reply brief, Plaintiff has taken no action to attempt to cure the deficiencies.

Defendant has shown that there is an absence of evidence to support Plaintiff's claims of race discrimination, harassment and retaliation.  In response, Plaintiff has asserted that there are questions of material fact for trial, but Plaintiff has not produced or pointed to any evidence of record that would create such an issue of fact.  Accordingly, in reviewing Defendant's motion for summary judgment the Court has only the evidence produced by Defendant before it to consider.  This evidence includes portions of Plaintiff's deposition.  The Court is mindful of its obligation to "construe the evidence and draw all reasonable inferences in favor of the nonmoving party."  *Minges Creek, L.L.C. v. Royal Ins. Co. of America*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita*, 475 U.S. at 587).  The failure of Plaintiff's counsel to argue the significance of the testimony or the inferences that should be drawn from it places the Court in a most awkward and difficult situation of attempting to review the record in the light most favorable to Plaintiff without abandoning the Court's neutrality.  *See* footnote 1.  Although the Court will attempt to treat Plaintiff's

---

its own work, and to assist the trial court by responding to the motion, pointing out as specifically as is reasonably possible facts that might demonstrate the existence of genuine issues.

980 F.2d at 406 (footnote omitted).

15

testimony fairly, the Court will not scour the record to seek out additional facts or legal theories that might conceivably be used to defeat the motion.  That was the obligation of Plaintiff's counsel.

### III.

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), prohibits an employer from discriminating against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race.  Where, as here, there is no direct evidence of race discrimination by the employer, the Court employs the burden-shifting approach first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *Johnson v. Kroger Co.*, 319 F.3d 858, 865-66 (6th Cir. 2003) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000)).

> Under the *McDonnell Douglas* framework, the plaintiff faces the initial burden of presenting a prima facie case of unlawful discrimination.  The establishment of a prima facie case creates a rebuttable presumption of discrimination and requires the defendant to "articulate some legitimate, nondiscriminatory reason" for taking the challenged action.  If the defendant is able to satisfy this burden, the plaintiff must then "prove that the proffered reason was actually a pretext to hide unlawful discrimination."

*Id.* (quoting *Johnson*, 215 F.3d at 573) (internal citations omitted).

To establish a prima facie case of race discrimination a plaintiff must introduce evidence to support the following four elements:  (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position

16

from which he was discharged; and (4) that he was either replaced by someone outside the protected class or treated differently than similarly situated, non-protected employees. *Noble v. Brinker Intern., Inc.*, 391 F.3d 715, 728 (6th Cir. 2004).

There is no dispute that Plaintiff has satisfied the first two elements of his prima facie case: he is African American and he suffered an adverse employment action in the form of successive disciplinary actions ultimately resulting in his termination. Defendant moves for summary judgment on Plaintiff's race discrimination claim because it contends that Plaintiff cannot establish either the third or the fourth element of his prima facie case.

To meet the third element Plaintiff must show that he was qualified for his position. In order to show that he was qualified, Plaintiff must produce evidence that he was performing his job "at a level which met his employer's legitimate expectations." *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990) (quoting *Huhn v. Koehring*, 718 F.2d 239, 243 (7th Cir. 1983)). A plaintiff "does not raise a material issue of fact on the question of the quality of his work merely by challenging the judgment of his supervisors." *Id.* (quoting *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1223 (7th Cir. 1980)). This is so because the aim of the court's inquiry is not to review bad business decisions, or question the soundness of an employer's judgment, but simply to determine whether the employee was performing to the employer's satisfaction. *Id.*

Defendant has produced substantial evidence that from the time Plaintiff began working in the File Plant, Defendant gave him considerable training, but the quantity and quality of Plaintiff's work never reached Defendant's expectations.

Plaintiff has offered no evidence to suggest that he was working up to his employer's expectations. He does not contest the fact that he was slow and that his work contained many errors. Even if the Court were to consider Plaintiff's unsigned affidavit, the affidavit is unresponsive to Defendant's assertion that Plaintiff was not qualified for the position. Plaintiff asserts in his unsigned affidavit that he had no errors in his work history at Steelcase through 2001, (Cutts unsigned Aff. at 6), but he does not address his performance in April 2002 when he received the Oral Reminder or in early August 2002 when he was given a Written Reminder. Plaintiff has accordingly failed to meet the third element of his prima facie case.

To meet the fourth element of the prima facie case Plaintiff must produce evidence that he was either replaced by someone outside the protected class or treated differently than similarly situated, non-protected employees. Plaintiff has not produced evidence regarding his replacement. Instead, he contends that he was treated differently than similarly situated, non-protected employees.

To be considered similarly situated in the disciplinary context, "the plaintiff must show that the 'comparables' are similarly-situated *in all* respects." *Noble v. Brinker Intern., Inc.*, 391 F.3d 715, 728-29 (6th Cir. 2004) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577,

583 (6th Cir. 1992) (internal quotations omitted) (emphasis in original). They must be

"nearly identical" in "all of the *relevant* aspects" of their employment. *Id.* at 729 (quoting

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in

original).

> [T]o be deemed "similarly situated," the individuals with whom the plaintiff
> seeks to compare his/her treatment must have dealt with the same supervisor,
> have been subject to the same standards, and engaged in the same conduct
> without such differentiating or mitigating circumstances that would distinguish
> their conduct or the employer's treatment of them for it.

*Id.* (quoting *Mitchell*, 964 F.2d at 583).

According to Swanson, who supervised approximately 20 employees in the Lateral

Trim Department, none had performance problems at all comparable to those of Plaintiff.

(Swanson Decl. ¶ 25). In his deposition Plaintiff identified the following employees as being

"similarly situated:" Tom Hoffer, Beth Toth, Brad Schmuker, Agustin Hernandez and

Carolyn Chandler. Hoffer, Toth and Schmuker are Caucasian. Hernandez is Hispanic and

Chandler is African-American. (Cutts Dep. at 307). Waalkes reviewed the files of these five

employees and verified that none of them had the kind of repeated performance issues

Plaintiff experienced, and none of them had been placed on a Written Reminder or a

Decision Making Leave. (Waalkes Decl. ¶ 27).

Plaintiff testified in his deposition that everyone in his department had errors that were

equivalent to this and had the identical work performance problems that he did, but that only

his errors were highlighted and only he received discipline while they did not. (Cutts Dep.

19

at 304-05). This Court is not required to accept Plaintiff's "unsubstantiated gloss on the evidence." *Noble*, 391 F.3d at 729. Plaintiff is not competent to testify about the work performance of his fellow employees. Plaintiff was not in a position to supervise their work, nor was he qualified to evaluate their work performance. Plaintiff has not shown that their performance was so poor as to warrant discipline. Plaintiff's assertion that he can prove through the other employees' work records and testimony that they had identical work performance problems is not sufficient to withstand a motion for summary judgment. Plaintiff is required to demonstrate with evidence that there is a genuine issue of material fact for trial. *Celotex,* 477 U.S. at 324-25. A mere assertion that he has evidence that he will bring to trial is not sufficient. Because Plaintiff has not come forward with evidence to create a genuine issue of fact as to whether he was treated differently than similarly situated non-protected employees, he has failed to satisfy the fourth element of his prima facie case.

Finally, even if Plaintiff had been able to make out a prima facie case, Defendant has articulated a legitimate, nondiscriminatory reason for taking formal disciplinary action against Plaintiff – Plaintiff's performance problems. Plaintiff's inability to perform his job satisfactorily was well documented and was recognized not only by his supervisors but by his co-employees as well. The evidence is unrebutted that Plaintiff's work performance remained unsatisfactory even after a year of training and coaching sessions that went well beyond what was required.

Plaintiff has not come forward with any evidence to suggest that Defendant's proffered reason for his discipline and discharge was actually a pretext to hide unlawful race discrimination. There is no evidence that any of Plaintiff's supervisors or managers made racially derogatory comments, or that they were motivated to take, or did take, any action regarding Plaintiff because of his race. Swanson and Waalkes have denied that Plaintiff's race played any part in his progressive discipline or his termination, (Swanson Decl. ¶ 26; Waalkes Decl. ¶ 25), and Plaintiff has produced no evidence in rebuttal. The Court concludes, as a matter of law, that Defendant is entitled to summary judgment on Plaintiff's Title VII race discrimination claim.

## IV.

Defendant has also moved for summary judgment on Plaintiff's allegation that he was subjected to a hostile environment and harassment on the basis of his race.

In order to establish a prima facie case of hostile work environment based on race under Title VII a plaintiff must show:

> 1) that he is a member of a protected class; 2) that he was subjected to unwelcome racial harassment; 3) that the harassment was based on race; 4) that the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and 5) the existence of employer liability.

*Newman v. Federal Exp. Corp.* 266 F.3d 401, 405 (6th Cir. 2001).

In order to maintain a hostile work environment claim, the victimized employee must show that under the totality of circumstances, the alleged conduct is "sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 351 (6th Cir. 2005) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).   Among the factors to be considered are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*   (quoting *Harris*, 510 U.S. at 23).   The harassment should be ongoing, rather than a set of isolated or sporadic incidents. *Id.* (citing *Allen v. Mich. Dep't. of Corr.*, 165 F.3d 405, 411 (6th Cir. 1999)).   The plaintiff must show that the working environment was both objectively and subjectively hostile. *Id.* (citing *Harris*, 510 U.S. at 21-22).   The Supreme Court has consistently held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."   *Newman*, 266 F.3d at 405 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations omitted)).

A racial hostile work environment claim is cognizable only if the purported harassment, viewed in conjunction with all of the circumstances, occurred because of the employee's race. *Farmer v. Cleveland Public Power*, 295 F.3d 593, 605 (6th Cir. 2002) (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999)).   As noted in *Jackson*, "even though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred

22

but for the fact that the plaintiff was African American."  191 F.3d at 662.  "Indeed, a showing of the use of racial epithets in a work environment may 'create an inference that racial animus motivated other conduct as well.'" *Id.* (quoting *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999).

In order to establish a racially hostile work environment under Title VII, the plaintiff must also prove that his employer "tolerated or condoned the situation," or knew or should have known of the alleged conduct and did nothing to correct the situation.  *Smith v. Leggett Wire Co.*,  220 F.3d 752, 760 (6th Cir. 2000) (citing *Jackson*, 191 F.3d at 659).

Plaintiff's hostile environment claim focuses on the actions of three of his co-employees – Leroy, Beth, and Rex.

Of these three, Leroy is the only one Plaintiff has accused of using a racial epithet. Plaintiff testified that in January 2002, Leroy, one of the line 3 set up people, called him "nigger" on one occasion, and said "Boy, get over here," on two occasions.  He also made statements such as "Watching you work is better than watching T.V." (Cutts Dep. at 220-24). Plaintiff said Leroy constantly made comments from January through March.  He explained that by constantly he meant several, or approximately five to ten times.  (Cutts Dep. at 224-25).  Although Plaintiff's testimony is not clear as to how many times Leroy made derogatory comments to him, he testified that he reported each instance to Swanson and Swanson did nothing.  (Cutts Dep. at 226).  He also testified that Leroy and Ron, who also worked on line 3, would harass him by calling him more often than was necessary to bring

missing parts, and highlighting Plaintiff's errors more than those of the other workers.   (Cutts

Dep. at 228-29).  The evidence of record indicates that everyone was aware that Leroy was

difficult to work with, and that he had a tendency of harassing any worker, regardless of race,

who was slow or who made mistakes.  (Cutts Dep. at 487; Ex. 32; Ex. 33).  Other employees

had warned Plaintiff that the employees on line 3 were hard to deal with.  (Ex. 29).

There are questions of fact in the record as to the number of times Leroy used racial

epithets or made derogatory comments to Plaintiff and the number of times Plaintiff reported

these incidents to Swanson.  There is also a question of fact as to whether Leroy's treatment

of Plaintiff was racially motivated.  Nevertheless, in light of the evidence that Leroy made

at least one racially derogatory statement toward Plaintiff, for purposes of this motion the

Court will assume that Leroy's other conduct toward Plaintiff was also racially motivated.

There is no dispute, however, that after the April 25, 2002, meeting when Waalkes and

Looyenga were informed that Leroy had used the racial epithet, they addressed the issue with

Leroy and with the entire department.  Plaintiff has not produced any evidence, nor has he

even alleged, that he heard any further racial epithets after Defendant's investigation into

Plaintiff's complaints in April 2002.  In fact, Plaintiff acknowledged in his August 20, 2002

charge with the MDCR that Steelcase had "addressed the actual acts of harassment."  (Ex.

39).

The second employee Plaintiff accuses of harassment is Beth.  Plaintiff testified that

after he trained Beth "and she felt that she got good or better than I was," Plaintiff asked her

24

"Can we share the load so that we can keep it productive going to the next department?" Beth looked at Plaintiff and said "Kiss my white ass." (Cutts Dep. at 232-33). Plaintiff responded that he didn't think she had much of one. (Cutts Dep. at 235). The exchange was reported to Swanson. Swanson verified Beth's inappropriate remark, and conducted a documented coaching session with her. According to Holtsclaw, who investigated Plaintiff's complaints of racial harassment, the intervention was effective as there was no evidence that those behaviors reoccurred. (Waalkes Decl. ¶ 12, Ex. SC 709-10). The evidence of record indicates that the exchange between Beth and Plaintiff was an isolated, inappropriate, crude and offensive utterance that was immediately addressed by the employer, but there is nothing in the record to support an inference that it was racially motivated.

The third employee Plaintiff accuses of harassment is Rex. Plaintiff testified that Rex took Plaintiff's notepad out of his hands, tried to tell Plaintiff how to do his job, changed the channels on Plaintiff's computer or turned it off, and moved Plaintiff's work tickets. (Cutts Dep. at 236-37, 240-41, 245-47). Plaintiff testified to his absolute belief that Rex's harassment of him was racially motivated. (Cutts Dep. at 239). Plaintiff's belief, however, is not supported by his stated rationale. Plaintiff testified that Rex's conduct was motivated by race because:

> number one, he felt that he's more secure and stable than what I am because of his seniority, because of his knowledge and expertise. He feel like he's more secure. He belong here. I'm a black man. I don't belong here . . . Felt like because he have knowledge, that he have power and control. . . . he was a corporate bully.

25

(Cutts Dep. at 239-40).

Plaintiff also complained generally that Tom Hoffer and some other unnamed employees were allowed to come in early, skip the start-up meeting, and claim the easiest work, leaving the more difficult work to the Plaintiff and making it harder for him to stay caught up. (Cutts Dep. at 251; Ex. 29). Plaintiff believed this situation constituted racial harassment because these employees had the support of the manager, while Plaintiff was not allowed to do the same. (Cutts Dep. at 251). According to Plaintiff's co-employees, Tom was able to get the easy work because he worked faster. Tom's conduct affected all the bay pullers, but the rest of them were able to work around it. (Ex. 32). After the issue of Tom getting the easy work was brought to Waalkes' attention, a new process was instituted which would eliminate this problem. (Ex. 32). None of the evidence presented supports an inference that the conduct at issue was racial harassment.

Upon review of the evidence presented it is clear that most of the harassment Plaintiff experienced was the direct result of his own work performance. The only evidence of any harassment that was based on race was the conduct and comments of Leroy. After Leroy's conduct was brought to the attention of the superintendent of the department, it was immediately addressed by Defendant. There is no evidence that Leroy caused Plaintiff any further problems. The evidence of record does not reflect harassment on the basis of race that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Clark*, 400 F.3d at 351. Moreover, none of

26

Plaintiff's complaints of racial harassment was left unaddressed.  Because there is no proof that Defendant "condoned severe or pervasive racial harassment," Plaintiff has failed to show discrimination based on a racially hostile work environment.  *Leggett Wire Co.*, 220 F.3d at 761.  The Court will accordingly enter summary judgment in favor of Defendant on Plaintiff's Title VII harassment/hostile environment claim.

## V.

Defendant has also moved for summary judgment on Plaintiff's claim that he was discharged from his employment in retaliation for filing a complaint with the Michigan Department of Civil Rights against Defendant for perpetuating a racially hostile work environment.

In order to make out a prima facie case of retaliation, a plaintiff must establish that:

(1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.

*Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).  "To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action."  *Nguyen*, 229 F.3d at 563.

Defendant contends there is no evidence of a causal connection between Plaintiff's filing of a civil rights complaint and his termination.  Defendant has presented substantial evidence that Plaintiff was disciplined and ultimately terminated for his poor work

27

performance.  (Swanson Decl. ¶ 26; Looyenga Decl. ¶ 11; Waalkes Decl. 25; Polmanteer

Decl. ¶ 19).

At his deposition Plaintiff identified statements by two Steelcase employees to support

his claim that there was a causal connection between his protected activity and his discipline

and termination.  The first of these statements was allegedly made by Holtsclaw, Defendant's

internal EEO official:

> She told me on two occasions, "James, if you ever go to Michigan Department
> of Civil Rights, to an attorney or to any outside force, we will at Steelcase
> contest it even if we are wrong.". . . "Even if we're wrong, what we'll try to do
> is work it out within Steelcase to the best of our ability, but if you ever go out
> to the public, we consider maybe even as whistleblowing, but we will contest
> it."

(Plaintiff Dep. at 429-30).

The second statement was allegedly made by Thomas Allsberry, the Plant Manager,

in April or May 2002.  Plaintiff testified that he spoke with Allsberry about his write up,

harassment, name calling, and sabotaging of his work.  (Cutts Dep. at 444).  According to

Plaintiff, Allsberry was  alarmed by the complaints of racism in his plant, and said he would

investigate Plaintiff's complaints.  (Cutts Dep. at 443).  When Plaintiff said he was going to

seek help outside, Allsberry responded by saying either "If you're communicating with

outside sources, you better not or we'll suspend your work here at Steelcase," (Cutts Dep. at

430), or "he wouldn't want to see me do that because that can be problems with your work

here at Steelcase," (Cutts Dep. at 445), or  "you should not go to anybody outside of here

because that could lead up to termination," or something to that effect.  (Cutts Dep. at 447).

28

Plaintiff could not remember in detail what Allsberry said, "but it was definitely a threat to my employment." (Cutts Dep. at 445-46).

Allsberry denies threatening Plaintiff with termination. According to Allsberry, he told Plaintiff that he had the right to go to the Michigan Department of Civil Rights, "but that we wanted to keep working with him to try and solve any problems or address any concerns that he had." (Allsberry Decl. ¶¶ 4-5).

Assuming, for purposes of this motion, that Holtsclaw and Allsberry made the statements attributed to them, the statements are nevertheless insufficient to show a causal connection between Plaintiff's filing of his civil rights claim and his discipline and termination. First, Holtsclaw's statement that Steelcase would vigorously defend against any civil rights complaint was not a threat of retaliation. Second, Plaintiff's recollection of Allsberry's statement is too vague to carry his burden of proof. Plaintiff does not recall whether Allsberry said Plaintiff would be suspended, that there could be problems with his work, or that it could lead up to termination.

Even if the Court assumes that the statements are sufficient to suggest a retaliatory motive, Defendant has come forward with unrebutted evidence that neither Holtsclaw nor Allsberry was involved in either disciplining Plaintiff or in terminating him. Swanson applied the progressive discipline toward Plaintiff based upon his performance problems under the supervision of Waalkes and Looyenga. (Swanson Decl. ¶ 26; Looyenga Decl. ¶ 8; Waalkes Decl. ¶ 17). Waalkes made the decision to terminate plaintiff after consultation

29

with Polmanteer and Looyenga.  (Waalkes Decl. ¶ 24; Looyenga Decl. ¶ 11; Polmanteer Decl. ¶ 20).  Allsberry was informed of the decision, but he did not participate in making it. (Waalkes Decl. ¶ 24; Allsberry Decl. ¶ 6).

"[T]he prima facie causal connection question is similar to the ultimate question of whether the defendant acted with retaliatory intent or motive." *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997).  However, "statements by nondecisionmakers" cannot suffice to satisfy the plaintiff's burden of demonstrating animus. *Smith v. Leggett Wire Co.* 220 F.3d 752, 759 (6th Cir. 2000) (quoting *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998)).  Because Holtsclaw and Allsberry were not decisionmakers with respect to Plaintiff's discipline or termination, their statements cannot be used to establish Defendant's retaliatory motive.

Plaintiff has not presented any evidence that could reasonably support an inference that his discipline and termination were in retaliation for his filing charges of discrimination with the MDCR.  He has not shown that he was treated differently by Defendant after he filed his discrimination charges.  Plaintiff filed his first charge of discrimination in August 2002.  Plaintiff's work performance problems began long before that and were first documented in his performance review in January 2002.  He received numerous coaching sessions before he was placed in the formal disciplinary program on April 25, 2002 with an Oral Reminder.  (Ex. 34).  He received a Written Reminder on August 2, 2002.  (Ex. 37). With each step of the formal disciplinary program he was warned that his failure to improve

30

would lead to his termination.  (Ex. 34; Ex. 37).  As Plaintiff's work performance problems continued, so did the application of subsequent steps in the disciplinary process.

Given Plaintiff's lengthy record of poor performance, his repeated failure to improve after numerous warnings, additional training, and a transfer to a new position, his termination was inevitable.  There is no evidence that Plaintiff's protected activity played any role whatsoever in his discipline or his termination.  Accordingly, the Court will enter summary judgment in favor of Defendant on Plaintiff's Title VII retaliation claim.

## VI.

Defendant has also moved for summary judgment on Plaintiff's parallel race discrimination, race harassment/hostile environment, and retaliation claims under the Michigan Elliott- Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2101 *et seq.*

Because the language of the ELCRA "strongly parallels" the language of Title VII, "Michigan courts have generally looked to federal precedent for guidance in interpreting the ELCRA."  *Hartleip v. McNeilab, Inc.*  83 F.3d 767, 775 (6th Cir. 1996) (citing *Radtke v. Everett*, 442 Mich. 368, 381-82, 501 N.W.2d 155, 162 (1993). *See also Jenkins v. Southeastern Michigan Chapter, American Red Cross*, 141 Mich. App. 785, 793, 369 N.W.2d 223, 227 (1985) (noting that it is appropriate to rely on federal precedent in deciding discrimination cases under ELCRA).  The only significant difference between the Title VII and ELCRA standards is that under ELCRA the plaintiff must show that filing his charge of discrimination was a "significant factor" in the adverse employment decision, which requires

31

more than the causal link required under Title VII. *Moore v. KUKA Welding Sys. & Robert Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

Because Plaintiff has failed to produce sufficient evidence to support his Title VII claims, the Court concludes that he has also failed to produce sufficient evidence to support his ELCRA claims. Accordingly, Defendant will be granted summary judgment on Plaintiff's state law claims as well.

## VII.

For the reasons stated herein, summary judgment will be granted in favor of Defendant Steelcase on all claims alleged in Plaintiff's complaint. In light of this disposition of Defendant Steelcase's first motion for summary judgment, its second alternative motion for summary judgment to limit damages will be denied as moot.

An order and judgment consistent with this opinion will be entered.


Date:    June 21, 2006              /s/ Robert Holmes Bell
                                    ROBERT HOLMES BELL
                                    CHIEF UNITED STATES DISTRICT JUDGE

32